Good morning, your honors. May it please the court, I'm Lois Boback for Appellants, Tustin Police Officers Gleason, Monsoor, and Rock. Could the clerk up the sound system a little, please? Yeah, maybe up your voice in there too. I tried to adjust it downward a little bit. It was up here. I'll stand a little bit closer. About four minutes of my time and I'll try to watch the clock. This case, this is admittedly a very sad case, but the fact that Mr. Quintanar's encounter with the police officers ended tragically doesn't mean that the police officers did anything wrong and it doesn't mean that they should be held civilly liable. There are really two different distinct time frames and the legal standards that apply are different for the two time frames. One is a fairly classic pedestrian check and the other is a Terry stop. The pedestrian check lasted about a minute when Officer Gleason arrived on the scene. There were three individuals behind the 7-Eleven and he engaged in conversation with the three of them. He asked them questions such as, who are you, what are you doing here, what's your relationship, and he asked Mr. Quintanar, do you have anything illegal in your possession? Mr. Quintanar cooperated with Officer Gleason and he answered the questions and he indicated that he had an illegal substance in his possession, turned out to be marijuana. That was a pedestrian check. Once Mr. Quintanar admitted to having medical marijuana, it converted to a Terry stop and the standards are very different so I'd like to discuss the two time frames differently and the application of qualified immunity for the police officers is different depending on the two different time frames. Let me ask you a question ma'am. With the facts that you've generally thrown in to this point on the pedestrian stop, is the fact that the plaintiff suggests that they were blocked from leaving, is that a fact we add in to the pedestrian stop? It is a factor in whether a pedestrian stop rises to the level of a seizure, but in this case there's no evidence that they were blocked at the time that the pedestrian stop occurred. Well, no evidence would suggest none whatsoever and the plaintiff suggests that he stopped his car with bright lights shining on the plaintiff and his girlfriend and that it blocked their way to leave. That's his testimony. There is, that's the allegation in the complaint, but the allegation, it's an unverified complaint and while that might be an allegation sufficient to strive a Rule 12b6 motion to dismiss, it's not sufficient evidence to defeat a summary judgment motion. In order to defeat summary judgment, the plaintiff has to submit admissible evidence and there was no admissible evidence to support the conclusion in the complaint that the access was blocked. There's a photograph at. Well, okay, but not the conclusion, but the that the car was parked in a certain way and that the lights were on. That's evidence. That's right. It was nighttime and the headlights were on. He did. There's no evidence that he came in with lights and siren. So yeah, he had his headlights on because cars are supposed to drive with their headlights on at night. There were, there were also, you can see in the video that there were also other lights in the back of the 7-Eleven. So the area was not illuminated solely by the headlights of the officer's car. In fact, but they're entitled to all inferences in their favor and said summary judgment, correct? So the evidence would be where the car was, that the lights were on, you know, all of that would be the evidence that the headlights were on and that the car was parked in the, that, that officer Gleason drove up in the back of the 7-Eleven. And you can see that from the video because you can see where the I think shows the area pretty well. And that's at page 123 of volume one of the, I'm sorry, 129 of volume one of the administrative record. I apologize, appellant's record on appeal. So there was, it shows, sorry, I interrupted you. Go ahead. That photograph shows an aerial view of the location of the 7-Eleven and it shows that there is behind it, behind, behind, between the 7-Eleven and whatever, I think it's an apartment complex behind it. There's a row of what appear to be carports and there's an, you can, you can move from that apartment complex into the rear of the 7-Eleven unimpeded. You just have to go around the carports. Then there's a drive aisle from the street down the right side of the 7-Eleven that also goes back into that area. And then between the 7-Eleven and an adjacent gas station, there's a short wall. I mean, there's nothing wrong with a police officer parking a car in a way that it would make it a little harder for someone to move if you want to talk to them, right? Right, but there were three distinct avenues of exit. One, one person, one of the three people that was initially there when Officer Gleason arrived actually left after he was asked a question or two by Officer Gleason. He felt free to leave, right? He, he, I don't know his subjective state of mind, but he left. He was asked one or two questions and then he left the scene. But the important part, and I guess I got it, was there was no verified complaint. That's correct. There was no affidavit filed of being blocked. That's correct. Thank you. The, I think plaintiff contends that Officer Gleason exceeded the scope of Mr. Quintanar's consent to be searched while waiting until backup arrived to serve him. What is your response to that? Is there any evidence in the record that the consent was qualified in any way or that he sought to revoke his consent? There was, there is no evidence in the record that the consent was limited in any way. Officer Gleason asked if he could search. Once, once Mr. Quintanar acknowledged, admitted that he had something illegal in his possession and told Officer Gleason that he had marijuana, I think at that point the stop could convert into a Terry stop because at that point Officer Gleason had objectively reasonable, an objectively reasonable belief that there could be criminal activity. So what are the facts that supported Officer Gleason's, what you're saying, his reasonable suspicion that Mr. Quintanar was contributing to the delinquency of a minor and that Mr. Quintanar unlawfully possessed marijuana? What are, what are the facts in the record? Specifically, I was concerned with the fact that here he and the young girl were drinking water in front of a lighted 7-Eleven. What would give him reasonable suspicion that he was contributing to the delinquency of a minor? He didn't need reasonable suspicion. I can't hear you. For the purposes of the pedestrian stop, he didn't need any suspicion that there was any criminal activity afoot. All he, all he had to do was make sure that, that his encounter at that, for that limited period of time, was not so coercive that Mr. Quintanar would not feel free to leave. If his tone, his demeanor, if he had blocked, if there had been five officers surrounding Mr. Quintanar during the period of the pedestrian stop, then I think that would all be evidence that would suggest that it was coercive and that he wasn't free to leave. But we don't have any of that evidence in this case. Doesn't Terry say, though, that, that police officers should check things out if they, I mean, that the girl was 13 and he was 19, right? Correct. And the officer said that he noticed an age discrepancy, appeared to be an underage minor, it was night. That's what piqued his interest in the first place. And that's what caused him to go over and say, what are you guys doing here? Who are you? How old are you? What's your relationship? Do you have anything illegal on you? As soon as Mr. Quintanar said, I have something illegal on me. I have marijuana on me. That gave off, that converted a pedestrian stop that didn't require any suspicion of criminal activity at all. Under established legal precedent from the Supreme Court down, you do not need any suspicion that there's something wrong going on. A police officer can approach anybody in any public place and ask them questions. The person can turn around and leave. They don't have to answer. We don't have a lot of time. I'm sorry. Can we get into the Mr. Quintanar produced a card? Yes. And so if let's, it wasn't according to the officers, a government issued medical marijuana card. And we have, I know, we have the pictures. There's no picture, right, of the defendant and it's not government issued. We now have a color photograph of the card that was provided by Mr. Quintanar to Officer Gleason on the night of the encounter. That was provided to me today. I'm assuming that you have one. If you don't, you're more than welcome to go. We do. We have it. Thank you. Under California law, a qualified patient who has a valid California state issued medical marijuana identification card is exempt from arrest if they have it in their possession and show it to the police. If they don't have that card in their possession, they're not exempt from arrest. And they can be arrested, but if they can then produce it for the prosecutor, they're exempt from prosecution. Mr. Quintanar wasn't immune from arrest because he did not have a valid medical state issued medical marijuana card. This card that was a copy, that we have a copy of, it was issued by OC Medical Group. I don't know whether that's a cooperative or a medical consortium of doctors, but it's not state issued. In order to be state issued, it has to have the name of either the state or the county Department of Health that has issued the card. This doesn't say Orange County Department of Health or Los Angeles County Department of Health. If he had issued a government issued card, would you concede that there was not probable cause to arrest? If he had it in his possession. If he had it in his possession. If he had it in his possession. California law is very clear that if you have it in your possession, and that's, I can give you the citation. It's in 11362.71E? Yes. If he had it in his possession and showed it to the officer, then he would not have been subject to arrest. But he didn't have a card, a legally issued card in his possession. Do you want to save the balance of your time? You're down to three minutes. Yes, thank you very much. So then we can focus the arguments after we hear what Apelli has to say. Good afternoon, Your Honors. It's a real pleasure, Dean Nelson, to see you. You don't remember me, but I'm class of 72. So you're the reason I'm here. Thank you. This is your dean? He was my dean, yes. Well, just tell me the year. 72, Your Honor. Oh, recently. Yeah, recently. Look, these two teenagers are behind the 7-Eleven in a parking lot. As soon as the bright lights hit them, which, of course, is not in the video, they're deer in the headlights. They have no illusion that they can leave. They have no illusion that this is a consensual encounter, and if they wanted to they could walk away and the policeman wouldn't do anything. As a matter of fact, there is a declaration in the excerpts of Mr. Quintanar's brother, who was at another 7-Eleven in Tustin, and the police stopped him and he walked away and they tackled him. Then they told him that they could arrest him for 148 for resisting arrest because they wouldn't talk to him. How is that relevant to our determination here? This happened a week before,  and also that Paula told Brani that the police were doing these things in the area and that he should be careful and take care of himself. I must say that, and I apologize, everything sort of came out badly, but I think you're allowed to do another aerial. This is a more recent one, and there are three cars in the parking lot back there, and I stopped by on my way this morning. It was about 5.30, so I made it in. And because I always thought that behind this row of sort of half garages that this was sunken here, but it's actually not. But there's a gate, and this is the only place you can walk in. There's a fence here that you can jump over, and in fact Paul Quintanar jumped over that fence. But the police car, and you can see from the video that the police car is here blocking the exit. So nobody was free to leave. So can an officer go, if you see, it's a 13-year-old, it's a minor, and Mr. Quintanar was 19, and it's out at night. Is there anything that prevents an officer from going up and finding out, you know, is it a runaway, is something going on, is that person held against their will or any, you know. I mean, because we see cases otherwise where, say, you know, if the 13-year-old had turned up in a ditch, dead, and the officers hadn't ascertained, you know, what are these two people doing together, is this minor okay in that situation. Is there anything wrong with just going up and, you know, adults, you know. And saying, are you okay? Yes, we're okay. Do you need any help? No, we don't need any help. Thank you, officer. We're going to go about our business of talking. We're friends. He said that it was his cousin. They said they were cousins, but that's not true, right? It's vernacular. Cuz? Cuz, yeah. It's vernacular. So, Counselor, as to the initial confrontation where there were questions asked, what is your best case that the police officer violated clearly known Supreme Court precedent? Best case actually is what we used when we went to dismiss, and it's what the judge said. No, no. I just want you to focus on that case because this officer, if I don't have to get to the first prong, I just look at the second prong, and I'm looking as the clearly established law the officer would have had to know about, what case would have been on the books that police officers should have known about not to go up and contact these kids and ask them questions. It is what was cited. Well, I looked at what's in your brief, and I don't think they get you there. So I'm trying to give you every benefit I can. So the one that I like, Joe, is I like what Judge Carter did, frankly. And Judge Carter didn't really give me a case. I mean, to be fair, I can't distinguish what happened here from U.S. v. Washington. Well, then we're in trouble.  But I don't think it is. And, Judge, it's Carney, not Carter in this case. Sorry. I said Carter, and I meant Carney. Sorry. But he says in his order that if I look at what Judge Carney said, I'll have the case. I don't want to take all your time. Okay. If the next thing I do is consent, it seems like your argument is he couldn't have waited for backup. And once he consented to search, he shouldn't have been waiting for backup. That seems to be your argument. What's your best case for that? Not that, Judge. I don't think.  What is your argument? My argument is the expert. He consented. He didn't have a choice. He didn't have a real choice. He's being, if you look at the video, you see two very slight teenagers, thin, very thin. You see a large policeman confronting them and saying, you know, do this, do that. He's consenting. He's saying, look, here's my medical marijuana card, and here's my marijuana and some of it. Well, I didn't need to because I didn't know about that until we got the consent. No, I think he says, I mean, there is another problem. He did say that he was on medical marijuana, and then he consented to the search, and then we come out with the cards, and we come out with a lot of stuff. Right. But I'm just trying to figure out, if I'm going to look at the second prong, what is the case which is going to say that the consent was wrong? The search was wrong. Or let's say even the search. The search was wrong. What's the case? He had no reason to say. I thought I briefed it all, but I guess not. Well, I know, but I read your brief, and I can't find anything to suggest in Supreme Court precedent that the consent was somehow invalid. We're talking about qualified immunity. That's what we're talking about. Qualified immunity doesn't mean that something, it doesn't mean something tragic didn't happen. I mean, this is clearly a tragedy, and I think everyone acknowledges that. But that being said, that if you look at the second prong, there has to be a Supreme Court case that clearly establishes that what the officer did, that he was on notice. So that's what Judge Smith is asking, and that's relevant to, because even if you find the first prong, you still have to go to the second prong on qualified immunity. Or if a court chooses, it can leap over the first prong and analyze it under the second prong. And one of my favorite cases on the issue is a case where Judge Posner in the Seventh Circuit writes, and I'm paraphrasing, and the case. K.H. through Morgan versus Murphy. Judge Posner writes, it's 914 F. Second, 846, 851, a 1990 case. And he basically says, look, we've squeezed this too far. We're looking for cases which are exactly on point or so similar that we've narrowed the exceptions to qualified immunity too much. And he's talking about issues in a foster care case. And he says, but wait a second. If the foster care system was selling these children into slavery, there's no precedent, but there's clearly a violation. Okay, let's go to the next one. After the consent and the search, what is the case I look at when they found what they did, marijuana and concentrated cannabis, and no good card that is an automatic get out of jail free that would suggest he should not be arrested? So there are really four lines of how that works. Or just give me a good case. Give me a good case, because the officer has the right to do whatever the law allows him to do. Now I'm at the point where the officer knows there's marijuana. The officer knows there's concentrated cannabis. The officer knows there's no card to get him a get out of jail free. And the officer decides to arrest. What case says the officer can't? Kamagi. Kamagi. Non-circuit case. Kamagi. Yeah, of course. Is that a Supreme Court case? No, it's a non-circuit case. I understand where it is, but I just know what I have to look for. Well, it's a non-circuit case. All non-circuit cases are published. They're not published. They're reported. I don't know what the correct nomenclature is, but whatever we do here today, people will be able to read. All right. So those are the cases I really ought to look at to see if the officer was on notice not to do what he did. Yes. But your hypothetical said no card. No card that gets him a get out of jail free. Well, it's the 11362.71 card. Is that an 11362.71 card? Absolutely not. But Kamagi, as I said, there are four different ways to go. There's Compassionate Use Act, which says you can have it if you have a doctor's recommendation, and you don't even have to have it on. You don't have to have anything. But then you have the official card that you get from the County of Orange, which almost nobody does. As a practical matter, why do that? Because you are ordinarily, except for I think it's in here once, unless you are a minority in Tustin, you're not going to get hassled over it. Minority. These guys are minorities, both of them. All right. But this is a card which is signed by a doctor, signed in print by a doctor, but this is a little better to read now on these copies. This is signed by Judith Boston. We have the examination that she did before this card was issued, and this says medical marijuana identification card. Does the law say, okay, we're having to look at it from the standpoint, what's a clearly established Supreme Court precedent that puts the officer on notice he can't do that? If 11362.71 requires a different type of card and that card would then say, hey, you can't arrest someone that has that type of card, what is out there that says? Kumagi. Kumagi says if you know that it's legitimate medical marijuana, it does not give you probable cause to arrest. But the facts are also that it's concentrated, and I believe that also the officer was told by Mr. Quintanar that he had another pending charge for drugs. It's the lesson in reality. You were district court judges and you've seen everything, Dean Nelson. So now we have Prop 47. It's all very exciting. Most people aren't arrested for, it's a new world, possession of heroin, although it's a misdemeanor, but people just don't bother. What people are arrested for is possession of heroin for sales because you can arrest somebody for that, and then you go through the procedure.  But a lot of these courts are not whether they can arrest someone or not, it's how they're treated when they go to court. As a practical matter, they're not even arrested. No one would have been arrested for this by anyone who understood the law, and there's lots of testimony that these guys were clueless. But for a 1983 case, the first prong is there has to be a constitutional violation, and then the second prong is on the qualified immunity, is there must be a Supreme Court case that puts the officer clearly on notice that the conduct is prohibited. It's not the officer's perception that he is wrongly violating the law. And in this case, Judge Carney used Kamagi for this about medical marijuana, and it's not necessarily a Supreme Court case. I don't agree that it has to be a Supreme Court case. It can be a Ninth Circuit case. Well, clearly established. Let's just go with clearly established law. It's of some worry to me that People v. Kelly is on the books, California case, 47 Cal 41008, which says if you got the card, no arrest. If you haven't got the card, then it's all about probable cause, and it's all about whether you have probable cause at the scene. And it says without the card, your idea that it's medical marijuana is at best an affirmative defense. You can be arrested nonetheless, and you can plead affirmative defense thereafter, but without the card, that's all you got is an affirmative defense. That's what People v. Kelly says. That's correct, Your Honor. And so, therefore, I'm saying you got the officer on the scene, you got the officer searching, finding what they have, knows there's two marijuanas, one marijuana might even fit with medical, the cannabis, I'm not sure it does. Not smart enough to know that. Just an old Idahoan. After that, I'm looking at the case. What says that officer was on notice, he could do no more? Your Honor, there is an opinion of the Attorney General, California State Attorney General, that goes back far before this. It says, concentrated cannabis is marijuana subject to the Compassionate Use Act. And in the very truncated stuff in my letter brief were some cases which said, recent cases which say, no, it's not what the officer thinks. It's what the law is. If he violates the law. But if you're talking about Comagi, that's a not published case, right? Yes. And it was with Goodwin, Pius, and Carney, right? Yes. Okay. Yeah, he knew that case. So the officers then have to read all the non-published cases on the Ninth Circuit that are not presidential? The decision in Comagi. Well, I'm just trying to figure out how do you put an officer on notice here? The decision in Comagi was based on other cases. Because I don't even have to follow Comagi. Don't. And you can reverse it. And if I were another district judge, another district judge wouldn't have to follow Comagi, right? Would likely follow Comagi, Judge. Well, they wouldn't have to, would they? It's not precedential for anything. It decides that particular case. If it had been published, then another district court would have to follow it. Right. No, that's correct. I mean, that's how Judge Carney came to this decision. And that's how the Ninth Circuit came to the decision in Comagi. We're like three and a half minutes over. If you want to summarize or if either of my colleagues have additional questions, I want them to be able to direct those. Thank you. I have no other questions. I asked him straight out what my questions were. No, you and I know we go back a little, Judge. We do. Okay. I do have a question. Yes, ma'am. Because the district court judge appeared to say there was a question of material fact on the issue of two things, but certainly qualified immunity. What is the precise question of material fact on the qualified immunity issue? It's whether they were free to leave. And there's no question at all that at least the one witness who was there and was detained says in her deposition, says in her declaration, says at every point that she was not free to leave ever. And the fact that they were detained, not on the street, hi, how are you, do you need my help, but detained physically. Their exit was blocked by the police car. The only exit was blocked by the police car and by the officer. And it's interesting, in her deposition, Ms. Faucito connects the bright lights with he told us to sit down and not talk, although they were time-wise slightly different. But that's the connection. I mean, that's her perception. And that's an issue of fact. That's for the jury. The jury has to decide whether her perception of those events happened. And remember, the defense in this case says, wait a second, everything's on the video. And I tried to get the sound up on that video. I actually sent it out. Nobody could help with that. But you have little sound. So you don't know what's on that video. You don't know what the facts are just from the video. And the bright lights are before the video. So, yeah, there's absolutely right from the get-go an issue of fact as to whether they were free to leave. And free to leave is the Supreme Court case. It's every Supreme Court case. Thank you for your argument. Thank you. Unless there are any questions, I'd like to address Judge Nelson's last question first, and that is what is the evidence that the trial court was looking at in determining that there was a question of fact as to whether or not these individuals were free to leave? I would submit, Your Honors, that if you look at the record, there isn't any such evidence. The trial court didn't cite any evidence, just said that there were tribal issues and listed a couple of areas where there were tribal issues, but didn't refer to any evidence. The testimony that Ms. Salcido gave, and I brought it up with me, with regard to whether she felt free to leave, made the clear distinction in time between before Mr. Quintanera admitted that he had drugs and after. When she was asked or when she testified that she was told to sit down and not talk, that's in the record and that was her testimony. But the next question, which Appellee's counsel doesn't reference, the very next question is, was that after Mr. Quintanera admitted that he had drugs? And the answer to that question was yes. So her testimony was, I was told to sit down and that I couldn't leave after Mr. Quintanera admitted that he had drugs. At that point, there was an objectively reasonable basis for detaining Mr. Quintanera to do an investigation to determine whether or not he was legally in possession of medical marijuana. That's a classic Terry stop. He can be detained at that point. He can be told, just hang on, wait, you can't leave. I need to determine whether or not you've broken the law. So if I understand you correctly, you're not saying there's a tribal issue because you agree at that point he wasn't free to leave. Exactly. With regard, after he admitted that he had drugs, he was no longer free to leave. Officer Gleason admitted as much. He wasn't free to leave at that point because Officer Gleason was doing an investigation to determine whether or not he was legally in possession of drugs. Officers aren't required to believe what they're told by suspects. If that were the case, nobody would ever get arrested or very few people would get arrested because very few people admitted to breaking the law. The officers have the right to detain somebody and ask them questions, do the search, determine whether it's legal. If he had been given a valid State-issued ID, then there wouldn't have been a basis for an arrest. I'm not even sure there was an arrest. No. This issue bothered me. And I looked at our cases of United States v. Kim and United States v. Drayton. In each of those cases, the district court made factual findings supporting a determination that there was no seizure. Unlike in those cases, here the district court has not made any factual findings that would support a determination that Officer Gleason's initial approach did not implicate the Fourth Amendment. But there are no findings that it did either. And more importantly, there's no evidence that it did. The district court had all of the evidence that you have before you now in front of the court when the court ruled on the motion for summary judgment. The fact that the court didn't do a detailed order, frankly, like most district courts do, often they're six, seven, ten pages long. We got a very brief order. There was no oral argument. But that doesn't mean that you can't make a determination as a matter of law that the undisputed facts that Officer Gleason was aware of at the time would lead a to determine that the initial, it was about a minute long, questioning before Mr. Quintanilla admitted that he had drugs, that that was legal under established U.S. Supreme Court and Ninth Circuit precedent. All right. Thank you for your argument. Thank you very much, Your Honor. Thank you for your argument. This matter will stand submitted and the court is in recess.
judges: D.W. Nelson, Callahan, N.R. Smith